UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

STATE AUTO PROPERTY AND
CASUALTY INSURANCE COMPANY,

       Plaintiff

v.                                Civil Action No. 2:08-0339

DANIEL J. RHODES and
CATHERINE RHODES and
LARRY F. GOOD, JR. and
BC DEVELOPMENT, INC.,
a West Virginia Corporation, and
CHARLES & CO. LLC,
a West Virginia
Limited Liability Company, and
CHARLES FRANGELLA and
CMH HOMES, INC.,
a Tennessee corporation,
and doing business as
Freedom Homes, and
REDMAN HOMES, INC.
a Delaware Corporation,

       Defendants

MEMORANDUM OPINION AND ORDER

      Pending are the cross motions for summary judgment of plaintiff State Auto Property and Casualty Insurance Company ("State Auto") and defendants Daniel J. Rhodes, Catherine Rhodes, and Larry F. Good, filed December 5, 2008.

I.

Plaintiff State Auto Property and Casualty Insurance Company ("State Auto") is an Iowa citizen. Daniel J. and Catherine Rhodes, Larry F. Good, Jr., Charles Frangella, BC Development, Inc. ("BC Development"), and Charles & Co., LLC ("Charles & Co."), are West Virginia citizens.[1] Mr. Rhodes and Good contend that they were formerly employed by the BC Development Defendants, at all relevant times. CMH Homes, Inc. ("CMH"), doing business as Freedom Homes ("Freedom Homes"), is a Tennessee citizen. Redman Homes, Inc. ("Redman Homes"), is a citizen of both Delaware and Michigan.

On or about March 14, 2001, Frangella visited Jackie Roberts, an agent employed by a State Auto's agent known as Johnson Insurance Agencies. Frangella delivered to Roberts a policy or quote from Erie Insurance Company that Roberts used to provide a comparison quote to Frangella from State Auto. (Dep.

---

[1]According to the official website of the West Virginia Secretary of State, BC Development was incorporated by Frangella on January 18, 2007. The same official source discloses that Charles & Co., of which Frangella is shown to be the sole member, was organized by him on June 29, 2005.

The Rhodes and Good have collectively referred to Frangella, BC Development, and Charles & Co. as the "BC Development Defendants." The court adopts that nomenclature for purposes of this memorandum opinion and order.

of Jackie Roberts at 10 (noting that she tried to match the Erie policy coverages "[a]s best that [she] . . . could . . . ."). According to Roberts, the Erie Insurance Company policy "was a tool for . . .[her] to use to quote [Frangella] insurance on . . . [a] building" that he owned.  (Dep. of Jackie Roberts at 10).

The Erie Insurance Company policy apparently covered an insured's employees as additional insureds.  That coverage, however, would have seemed superfluous to Frangella when he met with Roberts, based upon his deposition testimony:

> Q   Okay, when you say that the coverage was for this property, what was your understanding of the terms of that coverage?
>
> A   My understanding of the terms was that if the place burns down, they cover it.  If someone slips on the ice, they cover it.  If someone breaks into the property, they cover it. That's my understanding, I mean, in a nutshell.  Obviously, there's more specifics than that, but that's my understanding. That's what we were covering.
>
> Q   Did you have an understanding as to whether or not -- if there were any employees of Charles & Co[.] . . . other than yourself, whether or not they would be covered under that policy if they got hurt on the property?
>
> A   I don't know.  I never did ask, nor did even consider it, because there weren't any other employees, and there weren't going to be any other employees.
>
> Q   Okay.
>
> A   And if there would be employees, that would change the whole dynamic of the company

3

anyway.  Then I would have to go get Workers'
Comp, and I'd have to get a different
liability policy, and everything would
change, so I had no reason to ask those
questions.
. . . .

Q    Do you recall whether or not . . . [Roberts
in 2001] told you the way the policy is
written, that it does not provide any
coverage if an employee of Charles & Co. gets
hurt while working?

A    She may have covered that.  Again, it
would've been to me a moot point, because I
had no employees . . . [a]nd I had no
intention of having employees.

(Id. at 113, 117).


On the matter of employee coverage, Roberts testified

as follows:

Q    How do you know[, as stated in your
affidavit, that] Mr. Frangella was aware the
policy did not provide coverage for employee
injuries or injuries arising from an
employment relationship?

A    We, the reason, I guess, that . . . would be
stated [in my affidavit] at the time was the
fact that we had -- I asked him if he had
employees, and he said no.  I said, "Your
policy["] -- I would have said, "Your policy
does not cover employees, because that's not
part of the stop gap.["]  We didn't do the
stop gap, so that would be why I would have
said that [in my affidavit].

Q    So since Charles & Co. didn't actually have
employees at the time, you did not tell him,
"Hey, this doesn't cover employees"?

4

> A    When Charles Frangella came in to write the
>       policy, he said it was just he and his
>       spouse, so Charles & Company wasn't even in
>       question at that time.
>
>       When he stated to me he did not have
>       employees, we did not offer the stop gap
>       coverage, because he did not have a need for
>       that with no employees, so I guess that's
>       where that came from.

(<u>Id.</u> at 19-21).

     During or shortly after his visit with Roberts in March 2001, she quoted Frangella the cost and coverage of a State Auto Policy, which became PBP 204714905 ("policy") and includes commercial general liability coverage.  Frangella purchased the policy, which named him, and perhaps his wife, as the insureds inasmuch as Charles & Co. was not yet in existence.[2]  The policy became effective March 14, 2001.  Roberts stressed to Frangella the importance of assuring that the policy met his needs:

> A    I said, "You need to review your policy and
>       make sure that it's what you wanted and what
>       we went over."  I mean, I told him that --
>       All he was concerned about was this building,
>       so basically, that's what we were
>       concentrating on, was the coverage on this
>       building, and the liability on this building
>       . . . .

(Dep. of Jackie Roberts at 17; <u>id.</u> at 16 ("[W]hen I deliver the

---

    [2]Charles & Co. LLC was formed sometime later, and it was substituted as the named insured on the policy in or about January 2007.

5

policy to anybody, I say, 'Please read your policy, and let me know if you have any questions,' because it's thick (indicating).").

       While he did not have the policy in hand at the time, on or about March 16, 2001, Frangella signed a Client Acknowledgment presented to him by Roberts stating materially as follows:

> The agent <u>Jacquelyn A. Roberts</u>, who represents JOHNSON INSURANCE AGENCIES, INC., has explained the coverage I have requested, and additional coverage available to me.  I understand the coverage and limitation of my insurance.

(Pl.'s Mot. Summ. J., Ex. E at 1).  With respect to reading the policy, as Roberts cautioned him to do, Frangella testified as follows:

> Q    When the policy was given to you, did you read the whole policy?
>
> A    Word for word every single page?
>
> Q    Yes, sir.
>
> A    Probably not.
>
> Q    Did you look through it all?
>
> A    Oh, yes.

(Dep. of Charles Frangella at 114).

Following the policy purchase, Roberts testified that she cautioned Frangella on more than one occasion to keep her apprised of any changes to his business operations so that she could monitor and, if necessary, change his coverages:

Q    Was there any discussion that, "Hey, if
     Charles & Co[.] . . . winds up with any
     employees, you need additional coverage"?

A    Several times throughout the years -- I eat
     here at this restaurant.  There have been
     several conversations with Mr. Frangella.
     Most of the time it was over these buildings.

     He added on to the building from the time
     that we wrote this, and again, it wasn't
     Charles & Co[.] . . . until like '07.  This
     is like '03, '04 and '05.  He added on to the
     buildings.

     I kept saying, "You only have $600,000 on
     that building."  He said, "Yeah, I know.  We
     need to up that," and that went on for about
     a year.

     . . . .

     So I've always -- most of the time it was
     here [at the restaurant that we] . . . had
     conversations about "If you do anything
     different, you need to let me know," or
     whatever, so that we could get him covered
     appropriately.

     . . . .

     What I specifically said to him was, "If you
     have any changes in your operation, you need
     to notify me so I can make sure you're
     covered properly."

(Id. at 20-21).

7

At some point, some or all of the BC Development
Defendants diversified and entered the housing and mobile home
development business.  Specifically, at some time prior to July
23, 2007, the BC Development Defendants agreed to transport and
erect manufactured homes sold and distributed by CMH.  It appears
the BC Development Defendants also performed similar services for
Champion Home Builders Co. ("Champion"), which may be affiliated
in some way with Redman Homes.

Again at some unknown time, Rhodes and Good became
employees of the BC Development Defendants.  On July 23, 2007,
Rhodes and Good were working on a Champion home at the direction
of the BC Development Defendants.  They were injured when the
home's roof collapsed.  On the accident date, Charles & Co. was
insured under the policy, having been, as noted, substituted as
the named insured in or about January 2007.

Following the incident, the Rhodes instituted a civil
action against the BC Development Defendants in the Circuit Court
of Jackson County ("Rhodes action").  Mr. Good instituted a
materially identical action in the same court against the same
defendants ("Good action").  The Rhodes and Good actions allege
claims against the BC Development Defendants for failure to
provide a safe workplace, negligence, and acting with a
prohibited deliberate intention in violation of West Virginia

Code section 23-4-2.  The <u>Rhodes</u> action also alleges a derivative loss-of-consortium claim by Mrs. Rhodes.[3]

On August 15, 2008, the circuit court allowed amendments to the complaints in both the <u>Rhodes</u> and <u>Good</u> actions. The amendments added State Auto as a defendant, along with claims seeking declaratory relief with respect to the policy.  On November 10, 2008, after considering the factors set forth in <u>Great American Ins. Co. v. Gross</u>, 468 F.3d 199, 211 (4th Cir. 2006), the undersigned denied a motion by the Rhodes and Good to stay or dismiss this action in favor of the ongoing state actions.

State Auto is currently defending Charles & Co. and Frangella in the <u>Rhodes</u> and <u>Good</u> actions under a reservation of rights.  On May 23, 2008, State Auto instituted this declaratory judgment action, contending that it has neither an indemnity nor a defense obligation under the policy.

The second page of the policy is entitled "QUICK REFERENCE" and lists in a table-of-contents format the various

---

[3]An examination of the remaining counts of the complaints, which Rhodes and Good contend allege breach of warranty, product liability, and failure to warn, does not clearly disclose if these three additional claims are pled against the BC Development Defendants or, instead, only against CMH and Redman Homes.  The court need not resolve the matter inasmuch as the issue is immaterial to the coverage questions presented.

sections of the policy.  The "Exclusions" section for the Bodily
Injury and Property Damage Liability section of the policy is set
off to the right and is otherwise apparent on the QUICK REFERENCE
page.  The "Exclusions[,]" subheading of the policy, which
appears on page 2 of the commercial general liability form in
boldface[4], includes the following coverage carve outs to which
the insurance "does not apply[:]"

    e.  Employer's Liability

        "Bodily injury" to:

            (1)  An "employee" of the insured arising out
                 of and in the course of:

                (a)  Employment by the insured; or

                (b)  Performing duties related to the
                     conduct of the insured's business;
                     or

            (2)  The spouse . . . of that "employee" as a
                 consequence of Paragraph (1) above.

(Compl. Ex. C. at 45).


        Based upon the exclusion, State Auto asserts that it
lacks either an indemnity or defense obligation under the policy.
The Rhodes and Good respond that Charles & Co. had a reasonable
expectation of coverage for their injuries and that State Auto

---

        [4]The "QUICK REFERENCE" page incorrectly reflects that the
exclusions begin on page 1.  Neither the Rhodes nor Good identify
this slight variance as material.

has not proven that the aforementioned exclusion applies. Specifically, the Rhodes and Good assert that the aforementioned exclusion was not conspicuous, not brought to the attention of Frangella, and that he neither read nor understood the provision.

II.

A.    Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support

the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 325 (1986).  If the movant satisfies this burden, then the
non-movant must set forth specific facts as would be admissible
in evidence that demonstrate the existence of a genuine issue of
fact for trial.  Fed. R. Civ. P. 56(c); <u>id.</u> at 322-23.  A party
is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

     Conversely, summary judgment is inappropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate
factual conclusions to be drawn are in dispute.  <u>Overstreet v.
Ky. Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

     A court must neither resolve disputed facts nor weigh
the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th
Cir. 1995), nor make determinations of credibility.  <u>Sosebee v.
Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party
opposing the motion is entitled to have his or her version of the
facts accepted as true and, moreover, to have all internal
conflicts resolved in his or her favor.  <u>Charbonnages de France</u>

12

v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are
"drawn from the underlying facts . . . must be viewed in the
light most favorable to the party opposing the motion."  United
States v. Diebold, Inc., 369 U.S. 654, 655 (1962).


B.   Analysis


In Luikart v. Valley Brook Concrete & Supply, Inc., 216
W. Va. 748, 613 S.E.2d 896 (2005), an administrator of an estate
for an employee who was killed in a work-related accident was
assigned the employer's coverage claims against its insurer
arising out of the accident.  The circuit court concluded that no
coverage obligation existed under the exclusionary language of
the applicable commercial general liability insurance policy
issued to the employer.  The administrator appealed, asserting,
inter alia, that the exclusionary language was void inasmuch as
it was not disclosed.  The exclusion at issue in Luikhart is
identical to the provision relied upon by State Auto in this
action.


The insurer in Luikart contended, in part, that the
exclusionary language was placed in boldface print in a
conspicuous place in the policy and that the employer's
representative admitted reading the terms and conditions of
coverage.  The Supreme Court of Appeals of West Virginia

13

revisited the standards governing the enforcement of exclusions found in an insurance policy:

West Virginia jurisprudence imposes a duty to make exclusionary language conspicuous, plain, and clear, and further imposes a duty to bring such exclusions to the attention of the insured. In this regard, we have held:

An insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

Moreover, "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion."

Id. at 752-53, 613 S.E.2d at 900-01 (citations omitted).

The supreme court of appeals observed that the exclusionary language in the policy under consideration in Luikart was set off by an emboldened subheading entitled "Exclusions."  The same is true of the subheading in this action. The fact that a table of contents was used in the Luikart policy, as in this case, negated the administrator's assertion that the boldface print was meaningless in view of the voluminous nature of the policy.

Respecting the requirement that the exclusionary language be brought to the insured's attention, the supreme court

14

of appeals observed the general rule that "the insurer may avoid
liability by proving that the insured read and understood the
language in question, or that the insured indicated his
understanding through words or conduct."  Id. (citation omitted).
In Luikart, a representative of the insured testified that he
read "[t]he terms and conditions of the coverage . . . [but the]
complete coverage, cover to cover, I have not read it cover to
cover."  Id.  This testimony was coupled with the fact that page
one of the "Commercial General Liability Coverage Form" in
Luikart provided as follows: "[v]arious provisions in this policy
restrict coverage. Read the entire policy carefully to determine
rights, duties and what is and is not covered."  Id.

        The same language appears on the Commercial General
Liability Coverage Form applicable in this action.  Additionally,
Roberts told Frangella to review the policy, assure it met his
coverage needs, and contact her with any questions.  Frangella
testified that he "look[ed] through it all."

        Other considerations are important as well in
determining whether the employee exclusion should be given effect
here.  It is apparent that Frangella was focused upon protecting
his real estate holdings from property damage and those injured
in proximity to those holdings.  He expressed no interest to
Roberts in 2001 about obtaining employee coverage.  Frangella

15

even conceded that Roberts may have informed him specifically that there was no employee coverage under the policy but deemed the information a "moot point" because he had no employees. Despite Roberts' pleas that he apprise her of any changes in his operations over the years, Frangella never notified her that employee coverage had become necessary.  He recognized, however, that if he employed individuals, it would require "a different liability policy . . . and everything would change . . . ."

Based upon the foregoing analysis, Charles & Co. lacked a reasonable expectation of coverage for employee injuries. Further, the employee exclusion was clear, conspicuous, adequately brought to Frangella's attention and understood by him based upon his insurance needs.  The court, accordingly, concludes as a matter of law that State Auto has neither an indemnity nor a defense obligation under the policy.

III.

In accordance with the discussion above, it is ORDERED as follows:

1.   That State Auto's motion for summary judgment be, and it hereby is, granted;

16

2.   That the motion for summary judgment of defendants
     Daniel J. Rhodes, Catherine Rhodes, and Larry F. Good,
     be, and it hereby is, denied.

The Clerk is directed to send a copy of this written opinion and order to counsel of record, to Charles Frangella at his last known address, and to the notice of process address for BC Development and Charles & Co. on file with the Secretary of State.[5]

ENTER:   August 4, 2009

John T. Copenhaver, Jr.
United States District Judge

---

[5]On or about August 7, 2008, the court learned that Mr. Frangella informally sought leave from the United States Magistrate Judge to represent himself, BC Development, and Charles & Co. in this action.  The court informed Mr. Frangella that he could proceed pro se to represent his own interests but that the corporate entities could not proceed likewise and, further, that he could not represent them.  Mr. Frangella was further advised that his failure to retain counsel to represent the corporate defendants could ultimately result in default judgment being rendered against them.

17